UNITED STATES DISTRICT COURT                    <u>ELECTRONIC PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                              :
JEAN MARC DESMARAT,                           :
                                              :
                              Petitioner,     :
                                              :         MEMORANDUM
              - against -                     :         <u>AND ORDER</u>
                                              :
DALE ARTUS, Superintendent,                   :         09-CV-231 (JG)
                                              :
                              Respondent.     :
------------------------------------------------------------ X

A P P E A R A N C E S :

         JEAN MARC DESMARAT
                  03A6318
                  Clinton Correctional Facility
                  P.O. Box 2001
                  Dannemora, NY 12929
                  Petitioner, *pro se*

         CHARLES J. HYNES
                  District Attorney
                  Kings County
                  350 Jay Street
                  Brooklyn, NY 11201-2908
         By:      Terry-Ann Llewellyn
                  Attorney for Respondent

JOHN GLEESON, United States District Judge:

         Jean Marc Desmarat, a prisoner incarcerated in the Clinton Correctional Facility

pursuant to a judgment of the New York Supreme Court, Kings County, petitions for a writ of

habeas corpus under 28 U.S.C. § 2254.  Desmarat challenges his conviction following a jury trial

of murder in the second degree.  Appearing *pro se*, Desmarat seeks habeas relief on the grounds

discussed below.  Oral argument was held on July 10, 2009, at which Desmarat appeared by

videoconference from the facility in which he is serving his sentence. For the reasons set forth below, the petition is denied.

BACKGROUND

A.    *The Offense Conduct*

The state's evidence at trial established that on the morning of June 27, 2002, in a motel room at the Windjammer Motor Inn, at 3206 Emmons Avenue in Brooklyn, Desmarat struck Frantz St. Lot's face and body, slashed his face and leg with a sharp object, and strangled him with his bare hands. St. Lot died as a result of being strangled. At approximately 5:30 a.m., St. Lot's body was found in an alley near the motel with his hands and feet bound with torn bed linens, a black garbage bag over his head, and a black garbage bag over his legs. Desmarat was arrested on July 1, 2002, after he surrendered to the police with his attorney.

B.    *The Procedural History*

1.    *The Evidence at Trial*

On June 26, 2002, at approximately 11:00 p.m., Marie Yveline St. Lot ("Marie") received a phone call for her brother, Frantz St. Lot ("St. Lot") from Marvin Brown, whom she did not know, at her home in Brooklyn. St. Lot spoke briefly with Brown and then left to meet him at Brown's house. Desmarat, whom Brown knew as "Jean," had asked Brown to call St. Lot and ask him to come over. St. Lot arrived at Brown's house and left with Desmarat in a gold-colored car driven by Desmarat.

The same evening, Imnier Pasquier and Aiyub Patel were working the night shift at the Windjammer Motor Inn. At approximately 1:00 a.m. on June 27, 2002, Pasquier, who was fluent in Creole, heard someone inside room 210 screaming in Creole, "Please Daddy, don't kill me. Don't kill me. Don't kill me." T. 365, 384, 398-400. Pasquier knew Desmarat as a

2

frequent guest of the motel and knew that he was staying in room 210 that evening. Frightened, Pasquier ran to Shabehram Irani, who was working the motel front desk and told him what he overheard, urging him to listen for himself. When Irani stood outside the door to room 210 he heard arguing but could not understand Creole. Irani also knew Desmarat as a frequent guest and knew that Desmarat had rented room 210 that evening.

At about 1:30 a.m., Desmarat called Pasquier and asked him for plastic bags, towels, and cleaning supplies, which Pasquier gave him. Patel supplied Desmarat with plastic bags. At approximately 2:00 a.m., Desmarat called Pasquier again and told him that he wanted to tell him something that he was "not supposed to tell." T. 370.

Desmarat, "edgy" and "sweating," told Pasquier that he had choked someone to death. T. 370-71. Desmarat claimed that the victim owed him money and showed Pasquier the body. Pasquier saw the torso of a dark-skinned man on the floor of Desmarat's room but was unable to see the victim's face because it was covered by a brown blanket. Desmarat told Pasquier that his life was in his hands, which Pasquier interpreted as a warning to keep quiet about the murder. Pasquier, who was frightened and in shock, told Desmarat that he did not want to get involved. Pasquier knew that Desmarat drove a gold Mitsubishi, which Patel helped Desmarat jump start later that night.

On June 27, 2002, at approximately 5:45 a.m., Ceciele Bryce arrived at work at the Palm Beach Adult Nursing Home, located at 2900 Bragg Street, across the street from the Windjammer Motor Inn. She saw a body on the ground behind the motel and called 911.

Police Officer Carolann Liguori was on routine patrol duty with her partner, Officer Dave Mason, when they received a call to respond to 2900 Bragg Street. When they arrived at the nursing home, they found the body of a black male with his head in a plastic trash

bag.  His arms and legs were hogtied.  He had marks on his back and torn pieces of money on top of him.

        The officers secured the crime scene and Liguori remained on the scene until 10:30 a.m.  Among the other officers who arrived at the scene was Detective Peter McMahon.  McMahon observed drag marks and blood on the ground leading from the victim's body to room 210 on the second floor of the Windjammer Motor Inn.  Detective McMahon was assisted by Detective Kluberdanz, who conducted a canvass of the rooms on the second floor of the motel and gained entry to room 210.  McMahon observed ripped dollar bills on the floor inside the room and outside of the window.  Detectives Daniel Austin and Wayne Quashie documented the crime scene through photographs and sketches and recovered physical evidence, such as blood around the victim's body and torn dollar bills.  They recovered blood from the path to room 210, a ripped dollar bill from the first floor hallway, and inside room 210, more torn and bloody dollar bills, as well as blood on the walls and furniture, fingerprints, laundry detergent, ripped bed sheets and newspapers.  McMahon learned during the investigation that Desmarat had rented room 210 the night before.

        A match could not be made from fingerprints recovered from the car that was parked near the victim's body.  However, a fingerprint from the wine chiller in Desmarat's motel room matched his left thumb print.  The victim was ultimately identified as Frantz St. Lot.  It was determined that he died due to strangulation between midnight and 5:00 a.m. on June 27, 2002.  The medical examiner noted that St. Lot had abrasions and contusions on his face and body and lacerations on his face and leg inflicted by a sharp object prior to death.  St. Lot had consumed alcohol and cocaine before his death.

On July 1, 2002, Desmarat surrendered with his attorney at the 61st Precinct. Later that day, Irani identified Desmarat in a lineup as the individual who rented room 210 at the Windjammer the night of June 26, 2002. Pasquier separately identified Desmarat from the lineup as the person who had told him that he had choked a man to death in his room on June 27, 2002.

Marie St. Lot identified her brother's body on July 12, 2002. Marie knew Desmarat because in 2000 her brother asked her to bail Desmarat out of jail in Boston, Massachusetts. At that time, Desmarat had accused St. Lot of kidnapping him. However, the kidnapping case against St. Lot was ultimately dismissed.

2.      *The Verdict, Sentence and Post-Verdict Motion*

On September 19, 2003, Desmarat was convicted of intentional murder in the second degree.

By *pro se* papers dated October 22, 2003, Desmarat moved, in the Supreme Court, Kings County, to set aside the verdict pursuant to N.Y. Crim. Proc. Law § 330.30. Desmarat claimed, *inter alia*, that (1) the prosecutor had violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *People v. Rosario*, 173 N.E.2d 881, 213 N.Y.S.2d 448 (1961), by allegedly failing to turn over the criminal record of the deceased victim and statements of police officer witnesses who did not testify at trial; (2) the prosecutor and the police failed to test the decedent's blood and fingerprints allegedly found near the decedent's body; and (3) the trial court committed reversible error by upholding the legality of the search of Desmarat's motel room and the seizure of evidence therefrom.

The trial court orally denied Desmarat's motion to set aside the verdict on November 6, 2003 and sentenced Desmarat to a prison term of 25 years to life.

3. *The Appeal and Collateral Proceedings*

    a. *The § 440 Motion*

By *pro se* papers dated June 18, 2004, Desmarat moved in the Supreme Court, Kings County, to vacate his judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10, asserting the same claims he had raised in his post-verdict motion in the trial court as well as claims that (1) the prosecutor improperly elicited hearsay testimony from Detective McMahon at trial; (2) the prosecutor improperly prevented the defense from cross-examining Detective Kluberdanz by failing to call him as a witness at trial; and (3) Desmarat's trial counsel was ineffective for, *inter alia*, failing to object to the hearsay elicited from Detective McMahon, failing to obtain the deceased victim's criminal record and 2000 Massachusetts kidnapping files, and failing to disclose to the court Desmarat's mental health record and to move for an examination pursuant to N.Y. Crim. Proc. Law § 730.

Desmarat's § 440 motion was summarily denied in a written decision and order dated April 1, 2005. The Supreme Court, Kings County, held that Desmarat's claims were either procedurally barred or meritless.

By *pro se* papers dated July 11, 2006, Desmarat moved, in the Supreme Court, Kings County, to renew and reargue the motion. In that motion, Desmarat argued for the first time that his trial counsel was ineffective for failing to investigate and present a defense of justification. On January 5, 2007, the Supreme Court, Kings County, denied Desmarat's motion to renew and reargue. On April 11, 2007, the Appellate Division denied Desmarat's motion for leave to appeal the January 5, 2007 decision. By certificate dated May 29, 2007, the New York Court of Appeals denied Desmarat's application for leave to appeal from the Appellate Division's April 11, 2007 decision and order.

b. *The Direct Appeal*

In November 2005, Desmarat's assigned appellate counsel filed a brief in the Appellate Division, claiming that the People had failed to prove that an emergency justified the warrantless entry and search of Desmarat's motel room and that the trial court's refusal to suppress the evidence recovered from Desmarat's hotel room was not harmless error.

By *pro se* papers dated November 9, 2005, Desmarat moved for permission to file a *pro se* supplemental brief. Desmarat also moved *pro se* on several occasions for an enlargement of the record to include St. Lot's out-of-state criminal record and for an enlargement of time in which to file his *pro se* supplemental brief. The Appellate Division denied the requests to enlarge the record, but granted the requests for an extension of time in which to file his *pro se* supplemental brief. The last extension was granted by decision and order dated June 20, 2006 and required Desmarat to file his *pro se* supplemental brief by August 23, 2006. Moving *pro se* in papers dated August 23, 2006, Desmarat again requested an enlargement of time to file his *pro se* supplemental brief and to have his assigned appellate counsel relieved and new counsel assigned. On October 24, 2006, the Appellate Division denied his motion and recalled and vacated its January 4, 2006 decision and order granting Desmarat permission to file a *pro se* supplemental brief. Desmarat's *pro se* motion to reargue was denied on January 19, 2007.

On March 27, 2007, the Appellate Division affirmed Desmarat's judgment of conviction. *People v. Desmarat*, 38 A.D.3d 913 (2d Dep't 2007). It held that the trial court properly denied Desmarat's motion to suppress the physical evidence. *Id*. at 916. It found that, "under the circumstances, the police were presented with an emergency situation" that permitted their warrantless entry and search of Desmarat's room and held that "the crime scene unit's

subsequent recovery of evidence from the motel room did not exceed the scope and duration of the emergency." *Id*. at 915.

By certificate dated June 26, 2007, Desmarat's application for leave to appeal to the New York Court of Appeals was denied. *People v. Desmarat*, 872 N.E.2d 881, 9 N.Y.3d 842 (2007).

c. *The Motion for a Writ of Error Coram Nobis*

By *pro se* papers dated September 21, 2007, Desmarat filed an application for a writ of error *coram nobis* in the Appellate Division. Desmarat claimed that appellate counsel was ineffective for failing to raise claims of prosecutorial misconduct (specifically, that the prosecutor withheld material documents), trial court error and ineffective assistance of trial counsel. Desmarat also claimed that the trial court (1) violated his right to a fair trial by submitting both intentional and depraved indifference murder counts to the jury; (2) violated his right to be present at a material stage of the trial by having sidebar conferences without Desmarat being present; and (3) committed error when it allowed trial counsel to proceed with the sentencing phase after Desmarat had submitted a motion pursuant to N.Y. Crim. Proc. Law § 330.30. Finally, Desmarat claimed that his trial counsel was ineffective for (1) failing to investigate and present a justification defense; (2) presenting a fallacious misidentification defense; (3) failing to object to the vagueness of the two murder counts presented to the jury; and (4) failing to protect Desmarat's right to a consular notification, pursuant to the Vienna Convention on Consular Relations.

In an affirmation dated November 20, 2007, Desmarat's appellate counsel, DeNice Powell of Appellate Advocates, explained why she did not raise certain issues on appeal.

In a decision and order dated March 11, 2008, the Appellate Division denied Desmarat's application for a writ of error *coram nobis*. It found that Desmarat had failed to establish that he had been denied effective assistance of appellate counsel pursuant to *Jones v. Barnes*, 463 U.S. 745 (1983) and *People v. Stultz*, 810 N.E.2d 883, 2 N.Y.3d 277 (2004). *People v. Desmarat*, 852 N.Y.S.2d 799 (2d Dep't 2008). By certificate dated June 24, 2008, Desmarat's application for leave to appeal the Appellate Division's denial of his application for a writ of error *coram nobis* to the New York Court of Appeals was denied. *People v. Desmarat*, 892 N.E.2d 406, 10 N.Y.3d 933 (2008).

    4.    *The Instant Petition*

Desmarat filed the instant petition on January 13, 2009, claiming that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 on various grounds. He raises two claims that he brought in his post-verdict motion in the trial court to vacate his judgment of conviction: (1) the prosecutor violated his rights under *Brady* and *Rosario* by failing to turn over Massachusetts state police records relating to the deceased victim's alleged prior kidnapping of Desmarat; and (2) Desmarat was denied the opportunity to cross-examine Detective Kluberdanz, the detective who first entered and searched Desmarat's motel room without a warrant. Desmarat also brings an ineffective assistance of appellate counsel claim on three grounds, alleging, as he did in his application for a writ of error *coram nobis*, that his appellate counsel was ineffective because she (1) raised weak arguments on direct appeal; (2) failed to argue that his due process rights were violated when both intentional murder and depraved indifference murder were submitted to the jury at his trial; and (3) failed to argue that Desmarat received ineffective assistance of trial counsel. Desmarat also claims that he was denied effective assistance of trial counsel because his counsel failed (1) to investigate the alleged prior

kidnapping of Desmarat by the deceased victim; (2) to obtain the police report relating to the

alleged kidnapping; (3) to present a justification defense based on the alleged kidnapping; (4) to

protect Desmarat's right to be present during all the material stages of the trial by having sidebar

conferences without Desmarat being present; and (5) to object when both intentional murder and

depraved indifference murder were submitted to the jury.  Desmarat also raises, for the first time,

a claim that his trial counsel was ineffective for failing to request a missing witness charge with

respect to the state's failure to call Detective Kluberdanz.

As discussed below, Desmarat's petition is denied.

DISCUSSION

A.      *The Standard of Review*

    1.      *Exhaustion and Procedural Default*

28 U.S.C. § 2254(b) prohibits a federal court from granting a petition for a writ of

habeas corpus unless the petitioner has first exhausted all available state judicial remedies.  In

order to exhaust those remedies, a petitioner must "fairly present[]" his federal constitutional

claims to the highest state court by apprising it of "both the factual and the legal premises of the

claim he asserts in federal court."  *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en

banc*).  The district court has discretion to deny a petition that contains both exhausted and

unexhausted claims on the merits.  28 U.S.C. § 2254(b)(2).  When an unexhausted claim can no

longer be exhausted in state court due to a procedural bar, it is deemed procedurally defaulted.

*See Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("[W]hen 'the petitioner failed to exhaust

state remedies and the court to which the petitioner would be required to present his claims in

order to meet the exhaustion requirement would now find the claims procedurally barred,'

federal habeas courts also must deem the claims procedurally defaulted." (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))).

A claim that has been procedurally defaulted in state court generally cannot be reviewed on the merits by a federal habeas court. *See Harris v. Reed*, 489 U.S. 255, 260-62 (1989) (explaining rationale for habeas corpus procedural default rule); *see also Coleman*, 501 U.S. at 750 (noting a state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors"). However, there are two circumstances in which a federal claim that has been procedurally defaulted -- or deemed procedurally defaulted due to the exhaustion requirement -- may receive federal habeas review.

First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750; *Teague v. Lane*, 489 U.S. 288, 298 (1989). A petitioner may establish cause by showing "that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials . . . made compliance impracticable." *Coleman*, 501 U.S. at 753 (internal quotation marks omitted). To show prejudice, a petitioner must demonstrate that the alleged error worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted).

Second, if the petitioner is unable to show cause and prejudice, his procedural default may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730

(2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)).  This ground for excusing

procedural default should be invoked only in "extraordinary" cases, as courts deem substantial

claims of actual innocence "extremely rare."  *Schlup*, 513 U.S. at 321-22.[1]

      2.     *Review of State Court Adjudications on the Merits Under AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed

the scope of federal habeas review of state convictions where the state court has adjudicated a

petitioner's federal claim on the merits.  28 U.S.C. § 2254(d).  Under the AEDPA standard, the

reviewing court may grant habeas relief only if the state court's decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  *Id.*[2]

The Supreme Court has interpreted the phrase "clearly established Federal law" to

mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of

the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also*

*Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001).  A decision is "contrary to" clearly

established federal law if "the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently than [the

Supreme Court] has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

A decision is an "unreasonable application" of clearly established federal law if a state court

"identifies the correct governing legal principle from [the Supreme Court's] decisions but

---

[1]     A procedural bar actually relied on by a state court to dispose of a claim may be found inadequate to prevent federal review on rare occasions where the state court applies the procedural bar in an "exorbitant" manner.  *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003).  This doctrine has no apparent application in a case in which an unexhausted claim is deemed procedurally defaulted, as that is a case in which by definition no state court has applied a procedural bar in any manner, exorbitant or otherwise.

[2]     This limited scope of review is often referred to as "AEDPA deference."  *E.g., Jimenez v. Walker*, 458 F.3d 130, 135 & n.2 (2d Cir. 2006).

unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413. "In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260 F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Interpreting *Williams,* the Second Circuit has added that although "'[s]ome increment of incorrectness beyond error is required … the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it refers to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

B.   *Desmarat's Claims*

  1.   *The Claimed Violations of* Brady *and* Rosario

Desmarat argues that he was denied his right to a fair trial and due process of law because the prosecution violated the disclosure obligation established in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and his right to obtain prior statements of prosecution witnesses as set forth

in *People v. Rosario*, 173 N.E.2d 881, 9 N.Y.2d 286 (1961), by withholding Massachusetts state police records regarding the alleged kidnapping of Desmarat by the deceased victim. Desmarat argues that "[t]his effectively prevented [his] counsel from presenting [his] defense of justification, and precluded the presentation of psychiatric evidence." Pet. 10.[3] This claim is exhausted because it was previously raised in Desmarat's § 440 motion, which was denied on April 1, 2005 by the state court.

The claim has no merit. *Brady* and its progeny require the prosecution to disclose to the defense any evidence that is favorable to the accused and material to either guilt or punishment.[4] *Brady*, 373 U.S. at 87. However, evidence of which a defendant has knowledge, or should reasonably have known of, is not *Brady* material. *See People v. Singh*, 771 N.Y.S.2d 908 (2d Dep't 2004). Because Desmarat, as the victim of the alleged kidnapping, had knowledge of the kidnapping police report he filed, that report was not *Brady* material. Desmarat argues that the kidnapping police record (as well as the deceased victim's criminal record) constituted *Brady* material because it included material exculpatory evidence. However, it is unclear how police records from the kidnapping in 2000 could contain evidence material to the 2002 murder charges, and Desmarat offers no assistance in this regard. The state court did not unreasonably apply clearly established federal law when it correctly found that St. Lot's criminal record was not *Brady* material, noting that it "was irrelevant to the defense, not exculpatory" because the defense theory was misidentification, not justification. Resp't Br., Ex. D ("April 1, 2005 State Court Decision") at 3.

---

[3]  "Pet." refers to Desmarat's petition, filed January 13, 2009; "Pet. Br." refers to Desmarat's brief; and "Resp't Br." refers to respondent's brief.

[4]  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Desmarat contends that the "kidnapping materials would not only prove that the decedent had in fact kidnapped [him], but would have also established the reason why decedent was determined to kidnap [Desmarat], if not kill him."  Pet. Br. 21.  The notes of interviews of St. Lot and his two accomplices, Desmarat continues, "would have revealed their motive for kidnapping [him] and … other vital information."  *Id*. at 22.  Desmarat further argues that the prosecution did not want this evidence introduced at trial because it would have enabled him to present a justification defense.  But Desmarat does not explain why an offense committed against him by St. Lot in 2000 would provide justification for his strangulation of St. Lot in 2002.  Nor does he explain what information might have been in the police reports that he was not already aware of, such that the absence of the reports precluded him from "presenting the defense of justification."  Pet. Br. 20.

Desmarat's argument that the notes of non-testifying police witnesses qualified as *Rosario* material that should have been disclosed to him is also without merit.  Pursuant to *Rosario*, the prosecution must provide the defense with criminal records of and copies of all recorded statements made by prosecution trial witnesses that are in the prosecution's control and that relate to the subject matter of the witnesses' testimony.  N.Y. Crim. Proc. Law § 240.45; *People v. Rosario*, 173 N.E.2d 881.  *Rosario* does not entitle the defense to statements of non-testifying witnesses.  It follows then, as was properly held by the state court, that no *Rosario* violation occurred based on the failure to disclose notes of non-testifying police witnesses.

Accordingly, because the state court's conclusion that Desmarat did not suffer either a *Brady* or a *Rosario* violation was not contrary to an unreasonable application of clearly established federal law, habeas relief is not available on these grounds.

2.     *Confrontation Clause Claim*

Desmarat contends that he was denied the right to a fair trial when he was denied the opportunity to cross-examine Detective Kluberdanz, the detective who first entered and searched his motel room without a warrant. Desmarat contends that McMahon gave "testimonial justification for the search," and that he should have been permitted to cross-examine Kluberdanz because McMahon was not present for the "warrantless search." Pet. Br. 17. At its core, the claim is that it was improper for the State to have called McMahon instead of Kluberdanz at the suppression hearing. Desmarat contends that because Kluberdanz entered the motel room and performed the search, he had a right to confront Kluberdanz.

This claim does not furnish a basis for habeas relief. Desmarat's argument that it was a violation of *Crawford v. Washington*, 541 U.S. 36 (2004), for the prosecution not to have called Kluberdanz to testify at the suppression hearing is without merit. *Crawford* held that testimonial statements may not be introduced against a defendant unless the declarant is unavailable and the defendant has had the opportunity to cross-examine the declarant. But *Crawford* is inapplicable to statements made at pretrial suppression hearings. *See, e.g.*, *People v. Brink*, 31 A.D.3d 1139, 1140 (4th Dep't 2006). In addition, because hearsay testimony is admissible at pre-trial hearings under New York law, I find nothing constitutionally troublesome with McMahon's testimony at the suppression hearing. *See* N.Y. Crim. Proc. Law § 710.60(4).

Accordingly, Desmarat's claim that he was unconstitutionally denied the opportunity to cross-examine Kluberdanz is denied.[5]

---

[5] To the extent Desmarat argues that the prosecution was obligated to call Kluberdanz at trial, he is also mistaken. A prosecutor is not required to call every witness to a crime at trial. *People v. Macana*, 639 N.E.2d 13, 84 N.Y.2d 173, 180 (1994). This claim is addressed in more detail below in the context of Desmarat's assertion that his trial counsel was ineffective for failing to request a missing witness charge.

Finally, because the claim has no merit, I need not decide whether it was procedurally defaulted in state court. Although Desmarat's claims that the prosecutor improperly elicited hearsay testimony from McMahon and that defense counsel was ineffective in failing to object to that testimony were raised in the motion to vacate judgment of conviction, they were summarily denied by the trial court who found that the trial record was sufficient to permit appellate review of these claims. *See* N.Y. Crim. Proc. Law § 440.10(2)(b) (when the trial record is

3.      *Ineffective Assistance of Counsel Claims*

Desmarat contends that his trial and appellate counsel were ineffective for various

reasons.  The Supreme Court established the following standard for claims of ineffective

assistance in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so
> serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  Unless a defendant makes both showings, it
> cannot be said that the conviction … resulted from a breakdown in
> the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Thus, to make out this type of claim, the

petitioner must demonstrate both (1) that his attorney's performance "fell below an objective

standard of reasonableness," *id*. at 688, and (2) that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at

694.

In assessing whether counsel's performance was deficient, judicial scrutiny "must

be highly deferential," and the court must "indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy."  *Id.* at 689 (internal quotation marks omitted); *accord Jackson v.

Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998); *see also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)

(*per curiam*) ("[C]ounsel has wide latitude in deciding how best to represent a client. . . .").  The

Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct,"

---

sufficient to permit appellate review of a defendant's claims brought in a motion to vacate a judgment of conviction,
such claims must be summarily denied).

*Wiggins*, 539 U.S. at 521, instead emphasizing that "'[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" *id.* (quoting *Strickland*, 466 U.S. at 688), which requires "a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 689).

To establish the required "reasonable probability" that counsel's errors changed the outcome of the case, the petitioner must show not just "some conceivable effect," *Strickland*, 466 U.S. at 693-94, but rather "a probability sufficient to undermine confidence in the outcome," *id.* at 694. This determination, unlike the determination whether counsel's performance was deficient, may be made with the benefit of hindsight. *Lockhart v. Fretwell*, 506 U.S. 364, 371-73 (1993).

The same test applies to claims regarding the performance of appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("The proper standard for evaluating [a] claim that appellate counsel was ineffective … is that enunciated in *Strickland v. Washington*."); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Appellate counsel need not present every nonfrivolous argument that could be made. *See id.* at 533 (citing *Jones v. Barnes,* 463 U.S. 745, 754 (1983)). Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategy choices any more than it may do so in evaluating the performance of trial counsel. *See Mayo*, 13 F.3d at 533 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). A petitioner, however, may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing matters that were patently and significantly weaker. *Cf. Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998)

("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.").

a. *Appellate Counsel*

Desmarat contends that his appellate counsel was ineffective because she (1) raised weak arguments on direct appeal; (2) failed to argue that his due process rights were violated when both intentional murder and depraved indifference murder were submitted to the jury at his trial; and (3) failed to argue ineffective assistance of trial counsel.

The first two claims are exhausted because they were raised in Desmarat's *coram nobis* application. The third claim is only partially exhausted because some of the grounds for ineffective assistance of trial counsel that Desmarat alleges his appellate counsel should have raised were not raised in his application for a writ of error *coram nobis*. Because all of Desmarat's ineffective assistance of appellate counsel claims are meritless, they are denied. The Appellate Division reasonably determined, when it considered Desmarat's motion for a writ of error *coram nobis*, that he was not denied the effective assistance of appellate counsel. *See People v. Desmarat*, 49 A.D.3d 662 (2d Dep't 2008). Without addressing the potential prejudice of the asserted errors, I conclude that appellate counsel's conduct did not fall below the objective standard of reasonableness.

i. *Choice of Arguments on Appeal*

Desmarat contends that he was denied the effective assistance of appellate counsel because his appellate counsel raised weak arguments on appeal. As stated above, appellate counsel is not deficient for failing to present every non-frivolous issue on appeal. *See Evitts v. Lucey*, 469 U.S. 387, 394 (1985) (emphasizing that appellate counsel "need not advance *every* argument, regardless of merit, urged by the appellant" (emphasis in original)). Here,

Desmarat has not established that his appellate counsel's performance was constitutionally inadequate.

Appellant counsel filed a well-written and persuasively argued brief on appeal, in which she presented a non-frivolous issue to the Appellate Division. Specifically, the brief challenged the trial court's decision upholding the legality of the warrantless entry and search of Desmarat's motel room. It argued that the emergency exception did not apply to Desmarat's case because there was no evidence that St. Lot's body had come from Desmarat's room or that another victim might have been inside his room. Appellate counsel also argued that the scope and duration of the search exceeded the emergency that purportedly justified it. Finally, she contended that the trial court's refusal to suppress the evidence recovered from Desmarat's room was not harmless error.

In addition, the record shows that Desmarat's appellate counsel considered his request that she raise the ineffective assistance of trial counsel claim, among others, and she explained to him why she did not see the merits of that argument. In a letter dated Sept. 28, 2005, Desmarat's appellate counsel wrote to him:

> Though you mentioned the [kidnapping] case in your letters, you never stated with any degree of specificity precisely how you think your trial lawyer could have used the [kidnapping] case or the decedent's criminal record to your advantage in the homicide case. You did not present a justification defense. You did not testify and make a self-defense claim, and there was no other evidence before the court that supports such a claim. More important, since you were the victim who reported the … kidnapping, you were obviously aware of the kidnapping claim you made against the decedent. Therefore, precisely how did the People's failure to turn over the [kidnapping] documents preclude you from advancing an alibi or justification defense?

Resp't Ex. M (*coram nobis* application, at Ex. D "Appellate Counsel's Reply to the Request of the Ineffective Assistance of Trial Counsel by Appellant"). Appellate counsel's decision to

forgo Desmarat's proposed argument for what she evidently believed was stronger argument on appeal does not demonstrate her deficiency but rather her discretion.

## ii.   *Failure to Challenge the Twin Murder Counts*

Desmarat challenges his appellate counsel's failure to argue that his due process rights were violated when charges of both intentional murder and depraved indifference murder were submitted to the jury. Because the underlying claim was not raised during the trial, it was unpreserved for appellate review. *See* N.Y. Crim. Proc. Law § 470.05(2). Nevertheless, as discussed below, Desmarat cannot demonstrate that he suffered any prejudice as a result of the asserted error of trial counsel. Because I find no merit to his argument that his trial counsel was ineffective for failing to object, I similarly conclude that his appellate counsel cannot be faulted for failing to raise the argument on appeal.

To the extent that Desmarat's claim challenges the sufficiency of the evidence supporting his intentional murder conviction, that challenge is also denied for the reasons discussed more fully below.

## iii.   *Failure to Argue Ineffective Assistance of Trial Counsel*

Desmarat's third basis for ineffective assistance of appellate counsel is appellate counsel's failure to argue ineffectiveness of trial counsel. Desmarat does not explicitly cite which errors of trial counsel should have formed the basis for his appellate counsel's ineffectiveness claim. Rather, he notes "See following grounds." Pet. 7. Based on a careful reading of his petition and memorandum of law, I conclude that the ineffectiveness of trial counsel grounds he contends his appellate counsel was deficient for neglecting are as follows: trial counsel's failure to (1) investigate the alleged prior kidnapping of Desmarat by St. Lot; (2) obtain the police report relating to the alleged kidnapping; (3) present a justification defense

based on the alleged kidnapping; (4) protect Desmarat's right to be present during all the material stages of the trial by having sidebar conferences without Desmarat being present; (5) object when both intentional murder and depraved indifference murder were submitted to the jury; and (6) request a missing witness charge with respect to the state's failure to call Detective Kluberdanz.

The above numbered claims (1)-(3), pertaining to investigations trial counsel may or may not have conducted, are based on matters outside the record, and thus could not be properly brought on direct appeal. *See e.g.*, *People v. Murchison*, 4 A.D.3d 376, 377 (2d Dep't 2004) (claim of ineffective assistance of counsel resting primarily on matters dehors the record cannot be reviewed on direct appeal). Accordingly, appellate counsel was not deficient for failing to raise these ineffectiveness grounds. In any event, because Desmarat's allegations as to his trial counsel's ineffectiveness are meritless, as he has failed to demonstrate any prejudice from any alleged error, his claim for ineffective assistance of appellate counsel based on these grounds must also fail. *See, e.g., Rolling v. Fischer*, 433 F. Supp. 2d 336, 351 (S.D.N.Y. 2006) ("[T]here can be no claim of ineffective assistance of appellate counsel where the underlying claims of ineffective assistance of trial counsel are themselves meritless.").

      b.     *Trial Counsel*

            i.     *Failure to Investigate the Kidnapping and Present a Justification Defense*

Desmarat contends that his trial counsel was ineffective for failing to investigate his alleged kidnapping by St. Lot, to obtain the police records relating to the alleged kidnapping and to present a justification defense based on the alleged kidnapping. In essence, his claim is that his trial counsel's choice of defense strategy -- one of misidentification rather than justification -- rendered him ineffective under *Strickland*. This argument is meritless.

The extent of trial counsel's investigation of the kidnapping case is unclear based on the record before me. However, it is clear that trial counsel did not forgo the justification defense for no defense at all. Rather, the transcript reveals that defense counsel presented a defense of misidentification. For example, in his closing argument, trial counsel highlighted DNA evidence showing that blood from three different people was found on the bedspread from the motel room and that while one sample matched the victim, no sample matched Desmarat. T. 667. He argued that the pipe that may have been used to beat the victim did not have Desmarat's fingerprints on it. T. 675. He argued that the line-up was unduly suggestive and pointed out that Patel, one of the motel employees who identified Desmarat at the line-up, failed to identify him at trial. T. 681, 696-97. He challenged the reliability of Pasquier's testimony that he saw the victim's body in a brown blanket by arguing that no blood or DNA was found on the blanket. T. 696. Trial counsel also argued that although the DNA evidence was consistent with the theory that there was a struggle between St. Lot and his murderer(s), none of that DNA could be linked to Desmarat, except for saliva on a bottle in the bathroom. T. 696. Finally, trial counsel argued, "[The DNA] is saying he wasn't there … [at] the time of the murder. [The DNA is] saying [Desmarat] had nothing to do with the struggle." T. 698. Based on the evidence, this was a reasonable strategy, one which does not demonstrate deficient representation.

Moreover, based on the record before me, Desmarat initially wanted his trial lawyer to present a psychiatric defense. In a letter to his trial counsel dated August 20, 2003, Desmarat directs his trial counsel to submit a "Motion/Notice of Intent to Present Psychiatrict [sic] Evidence at trial" pursuant to N.Y. Crim. Proc. Law § 250.10. Resp't Br., Ex. M ("Petitioner's Application for a writ of error *coram nobis*") at Ex. C. He explains that the "issue is … whether I lacked the foresight into the consequences of my actions, and whether I knew or

APPRECIATED the consequences of wrongfulness of my action AT THE TIME THE CRIME

WAS COMMITTED DUE TO MENTAL DISEASE OR DEFECT." *Id.* (emphasis original).

Desmarat explained, "Therefore I request and expect that you will arrange an exam by

FORENSIC SPECIALIST that mitigation purposes and for an AFFIRMATIVE DEFENSE." *Id*.

He concludes, "It is my wish that you present these issues, which are an AFFIRMATIVE

DEFENSE and may very well be my Defense as well as My Justification Defense." *Id.* In

addition, Desmarat completed a *pro se* "Notice of Intent to Present Psychiatric Evidence" for the

court dated August 19, 2003. *Id.* However, this defense strategy was abandoned when the

prosecution requested that Desmarat submit to an examination by the state's psychiatrist. Resp't

Br., Ex. C, at 13. Furthermore, Desmarat did not argue in his motion to vacate his judgment of

conviction that his trial counsel was ineffective for failing to present a justification defense based

on the 2000 kidnapping or failing to investigate that incident. Resp't Br., Ex. B.[6] In fact, the

first time Desmarat raised the argument that his trial counsel was ineffective for failing to present

the "kidnapping" justification defense was in his July 11, 2006 motion to renew his § 440

motion. Resp't Br., Ex. E at 18. As the Supreme Court has noted, "The reasonableness of

counsel's actions may be determined or substantially influenced by the defendant's own

statements or actions. Counsel's actions are usually based, quite properly, on informed strategic

choices made by the defendant and on information supplied by the defendant." *Strickland*, 466

U.S. at 691. Viewing defense counsel's actions in the context of Desmarat's own request to raise

a psychiatric defense and in the absence of evidence that Desmarat wanted his counsel to present

a defense based on the 2000 kidnapping, I cannot conclude that trial counsel's ultimate strategy

fell below an objective standard of reasonableness.

---

[6]     However, in the section alleging prosecutorial misconduct, Desmarat notes his defense counsel's
failure to obtain the 2000 kidnapping documents. Resp't Br., Ex. B at 6-7.

Moreover, based on the facts alleged by Desmarat and the documents in the record, the prior kidnapping case would not have provided the basis for the justification defense Desmarat desired. There is no indication that additional investigation would have revealed information about the kidnapping beyond Desmarat's personal knowledge of events or revealed a stronger justification defense. According to his papers, Desmarat argues that evidence of the kidnapping "would have, in all probability, affected the verdict" because "[a]ny reasonable jurist would have debated whether or not the Petitioner was in fact defending himself against the decedent's vicious criminal act." Pet. 11. Desmarat contends that he was justified in killing St. Lot because he was acting in self-defense. *Id*. at 14. However, while documents pertaining to the prior kidnapping would have established that Desmarat and the deceased knew each other and were hardly friends, I cannot see how they would have demonstrated that Desmarat was justified in killing St. Lot two years later.[7] Desmarat claims that the kidnapping records would show that St. Lot was the initial "aggressor, and that [Desmarat] was forced to defend himself." Pet. Br. 27. To the extent Desmarat is arguing that because St. Lot was the "initial" aggressor in 2000, he was justified in defending himself in 2002, Desmarat misunderstands the concept of initial aggressor in the context of self-defense. Indeed, it may have amounted to deficient performance for defense counsel to have made the argument Desmarat proposes, especially in light of Brown's testimony at trial that Desmarat initiated contact with St. Lot by asking Brown to call St. Lot and have him come to Brown's house and that Desmarat and St. Lot left together in Desmarat's car. T. 624-26. Regardless of the strength of a justification defense in this case, however, Desmarat's claim that his counsel was ineffective for failing to present it would require

---

[7]     Some of the police reports from the 2000 kidnapping were attached as exhibits to Desmarat's *coram nobis* application. Having reviewed them, I do not see how they would have added information that Desmarat could not have provided to his lawyer himself, nor do I see how they would have supported a justification defense.

precisely the sort of second-guessing of trial counsel's strategic choices that is prohibited by *Strickland*.

ii.     *Failure to Protect Desmarat's Right to be Present at Sidebar*

Desmarat's claim that his trial counsel failed to protect his right to be present during all material stages of the trial by having sidebar conferences without him present is meritless. In New York, a defendant's right to be present at all material stages of a trial pursuant to N.Y. Crim. Proc. Law § 260.20 "does not extend to circumstances involving matters of law or procedure that have no potential for meaningful input from a defendant." *People v. DePallo*, 754 N.E.2d 751, 96 N.Y.2d 437, 443 (2001) (noting, however, a defendant's right to be present "at ancillary proceedings when he … may have something valuable to contribute or when presence would have a substantial effect on [his] ability to defend against the charges"); *see also People v. Williams*, 650 N.E.2d 849, 85 N.Y.2d 945 (1995) (right to be present at material stages extends to impaneling the jury, introduction of evidence, summing up to the jury, charge of the court, receiving and recording the verdict, *Sandoval* hearings, voir dire of prospective jurors and suppression hearings); *People v. Antommarchi*, 604 N.E.2d 95, 80 N.Y.2d 247, 250 (1992) (reading N.Y. Crim. Proc. Law § 260.20 to include right to attend sidebar conferences during voir dire with prospective jurors regarding possible bias). In addition, this right can be voluntarily waived. *See People v. Abdullah*, 28 A.D.3d 940, 941 (2006). Moreover, a defendant alleging such a violation must present an adequate record for appellate review. *See* N.Y. Crim. Proc. Law § 470.05(2); *People v. Kinchen*, 457 N.E.2d 786, 60 N.Y.2d 772, 773-74 (1983).

Although Desmarat makes reference to "more than ten sidebar conferences" at which he was not present, he does not cite to any pages in the trial record demonstrating his absence. The lone page reference to a complained of sidebar is in his *coram nobis* application, in

which he cites to a colloquy between the Judge and defense counsel. T. 534-35.[8]  At this

sidebar, the Judge offered defense counsel instruction regarding the mechanics of his

questioning.  Although the record does not indicate whether Desmarat was present for the

sidebar, the colloquy certainly had "no potential for meaningful input" from Desmarat and thus

was not an occasion at which he had a right to be present.  Therefore, defense counsel cannot be

faulted for attending a sidebar without his client.  Accordingly, trial counsel's conduct was

neither incompetent nor prejudicial, and Desmarat's contention that his rights were violated is

without merit.

> iii.  *Failure to Object to Both Intentional Murder and Depraved*
> *Indifference Murder Counts Being Submitted to the Jury*

Desmarat alleges that his trial counsel was constitutionally inadequate because he

failed to object when both intentional murder and depraved indifference murder were submitted

to the jury.

In New York, a trial court may submit both intentional murder and depraved

indifference murder to a jury if "a verdict of guilty upon either would be supported by legally

sufficient trial evidence."  N.Y. Crim. Proc. Law § 300.40(5).  In these circumstances, "the court

may submit both counts in the alternative and authorize the jury to convict upon one or the other

---

[8]       The conversation at sidebar was as follows:
THE COURT:     Mr. Harrison, in order to ask a witness a question, you should have some good faith basis for thinking that they would have the answer to the question.  This is not a person who responded to the scene, and I don't think you have any basis for thinking that he did.  The point in questioning witnesses is to get information, not to make your point about, you know, what you think should or should not have been done --
MR. HARRISON: Yes, your Honor.
THE COURT:     --through the witness.  So if we're going to go through all the crime scene pictures -- as soon as you picked the crime pictures up, I was wondering why you were going in that direction.  Inasmuch, we have no reason to think that he would know anything about the crime scene.
MR. HARRISON: I'll go in another direction and achieve the same point.
THE COURT:     I mean, there's some questions you could ask him.  Certainly, Mr. Reeves used him as an expert of sorts dealing with issues that weren't directly involved with his specific examination, but, you know, it has to be within, you know, certain parameters or else it's a waste of time.
MR. HARRISON: Yes, your Honor.  Understood.
THE COURT:     Let's go back inside.  Thank you.
T. 534-35.

depending upon its findings of fact." *Id*. However, because a verdict of guilt for intentional

murder is logically inconsistent with one for depraved indifference murder, "the court must

direct the jury that if it renders a verdict of guilty upon one such count it must render a verdict of

not guilty upon the other." *Id*. Here, the court properly instructed the jury that it could find

defendant either not guilty of both counts or guilty of only one count, but it could not find him

guilty of both counts. T. 751-53, 772.

      Desmarat contends that the charge was improper because there was not sufficient

evidence to convict on either count. When there is legally sufficient evidence to support a

conviction of depraved indifference murder has been a source of considerable discussion in New

York's courts. *People v. Payne*, 819 N.E.2d 634, 3 N.Y.3d 266 (2004) and *People v. Suarez*,

844 N.E.2d 721, 6 N.Y.3d 202 (2005), held that depraved indifference murder is not committed

when the defendant acts with the manifest intent to kill his victim. Thus, it would be the rare set

of facts that could sustain both charges. Elaborating on the principle that "[i]ndifference to the

victim's life, … contrasts with the intent to take it[,]" the New York Court of Appeals held in

*Payne* that a defendant who shot and killed his friend at point-blank range did not commit

depraved indifference murder because the use of a weapon can never result in depraved

indifference murder when there is a manifest intent to kill. *Id.* at 270-71. The court explained

that depraved indifference murder is an appropriate charge where a defendant lacking the intent

to kill shoots into a crowd or otherwise endangers innocent bystanders or where a defendant's

acts are directed at a particular victim "but are marked by uncommon brutality--coupled not with

an intent to kill…, but with depraved indifference to the victim's plight." *Id*. at 271 (citing

examples such as inflicting continuous beating on a child). In *Suarez*, the New York Court of

Appeals held that, "the statutory provision that a defendant act '[u]nder circumstances evincing a

depraved indifference to human life' constitutes an additional requirement of the crime--beyond mere recklessness and risk--which in turn comprises both depravity and indifference….'' 6 N.Y.3d at 214. A year later in *Feingold*, the court stated: "[w]e say today explicitly what the Court in *Suarez* stopped short of saying: depraved indifference to human life is a culpable mental state." *People v. Feingold*, 852 N.E.2d 1163, 7 N.Y.3d 288, 294 (2006).

Desmarat's reliance on *Payne* and *Suarez* in his case is misplaced. At the time of Desmarat's trial in 2003, *Payne* and its progeny had yet to be decided. Thus, trial counsel cannot be faulted for failing to act upon the depraved indifference standard they announced. *See People v. Smith*, 880 N.Y.S.2d 760 (3d Dep't 2009) (finding defense counsel was not ineffective for permitting trial court to charge both intentional and depraved indifference murder in the alternative as law was unsettled at time of defendant's trial in 2004). Rather, *People v. Sanchez*, 777 N.E.2d 204, 98 N.Y.2d 373 (2002), was the controlling law at the time, which, following the rule articulated in *People v. Register*, 457 N.E.2d 704, 60 N.Y.2d 270 (1983), construed the "under circumstances evincing a depraved indifference to human life" element as an "additional requirement refer[ring] to neither the *mens rea* nor the *actus reus* … but rather a definition of the factual setting in which the risk creating conduct must occur …. an objective assessment of the degree of risk presented by [a defendant's] reckless conduct." *Sanchez*, 98 N.Y.2d at 379-380 (quoting *People v. Register*, 60 N.Y.2d 270, 275-277 (1982)). Thus, the required mental state for depraved indifference murder was recklessness and the depravity and indifference was assessed objectively based on the facts and circumstances of the crime. Based on the facts of Desmarat's case, and the state of New York law at the time, the charge as given was not inappropriate, so counsel cannot be faulted for failing to object to it.

Even under the current standard as clarified by *Payne* and its progeny, based on the unusual facts of this case there was sufficient evidence for a jury to have found Desmarat guilty of either intentional or depraved indifference murder.[9]  Although the New York courts have explained that one-on-one violence rarely satisfies the depraved indifference standard, courts recognize an exception for conduct directed toward a single individual when the conduct is characterized by "uncommon brutality" and have found that strangulation and death resulting from severe beatings can qualify.  *Payne*, 3 N.Y.3d at 271-72 ("Absent the type of circumstances in, for example, *Sanchez* (where others were endangered), a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder."); *see also People v. James*, 15 Misc. 3d 1113(A) (N.Y. Sup. 2007) (finding that strangulation could "reasonably be categorized as an act of uncommon brutality").  The evidence of the conduct leading to St. Lot's death -- lacerations, beatings and manual strangulation -- could certainly be characterized as "uncommon brutality."

Moreover, Desmarat was not convicted of depraved indifference murder and thus, even assuming defense counsel erred, Desmarat can demonstrate no prejudice for having been charged with it.  *See People v. Brown*, 46 A.D.3d 949, 952 (3d Dep't 2007) (although the twin counts of intentional and depraved indifference murder were submitted to the jury no ineffective assistance of counsel where the defendant was convicted only of intentional murder; "thus, there is no view of the record which would support the conclusion that trial counsel's error had any

---

[9]     Desmarat also notes in his memorandum that "With the exception of the strangulation of the decedent, there no evidence presented … which supported the guilty verdict on the intentional murder count."  Pet. Br. 5.  However, evidence of strangulation alone left ample room for the jury to conclude that St. Lot's death was intended.

impact on the outcome of the case"). Accordingly, Desmarat's claim of ineffectiveness of counsel on this basis is denied.[10]

iv. *Failure to Request a Missing Witness Charge*

Desmarat also alleges that his trial counsel ineffectively failed to request a missing witness charge with respect to the prosecution's failure to call Detective Kluberdanz. A missing witness instruction "allows a jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events." *People v. Savinon*, 791 N.E.2d 401, 100 N.Y.2d 192, 196 (2003). To be entitled to a missing witness charge under New York law, Desmarat would have had to show that (1) Kluberdanz was knowledgeable about an issue material to the trial; (2) he was expected to give noncumulative testimony favorable to the prosecution; and (3) he was available to the prosecution. *See Farr v. Greiner*, Nos. 01 CR 6921 & 01 CV 6921, 2007 WL 1094160, at *13 (E.D.N.Y. Apr. 10, 2007); *People v. Macana*, 639 N.E.2d 13, 84 N.Y.2d 173, 177 (1994). Thus, "[n]o instruction is necessary where the unpreserved testimony would be merely cumulative." *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988); *People v. Gonzalez*, 502 N.E.2d 583, 68 N.Y.2d 424, 427 (1986) ("[I]t must be shown that the uncalled witness … would naturally be expected to provide noncumulative testimony favorable to the party who has not called him….").

---

[10] To the extent Desmarat is raising a sufficiency claim, it too is denied. A petitioner has "a very high burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence," because a court views the evidence in a light most favorable to the prosecution. *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). A habeas court must decide "whether the record is so totally devoid of evidentiary support [such] that a due process issue is raised." *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995) (internal quotation marks and citation omitted). The prosecution theory was intentional murder. *See e.g.,* T. 724 ("He intended to kill Mr. St. Lot. …I would suggest to you that the defendant killed this man on purpose."). And there was sufficient evidence to conclude that Desmarat intended to kill St. Lot when he strangled him. Here, the record is not devoid of evidentiary support for the verdict and a rational trier of fact could have found the essential elements of intentional murder beyond a reasonable doubt.

31

At trial, Detective McMahon testified about the police investigation of the crime scene. T. 444-93. Given McMahon's testimony, one would not "naturally expect" Kluberdanz, another officer on the scene, to provide noncumulative testimony, and Desmarat has made no showing otherwise. Accordingly, an instruction regarding the government's failure to call Kluberdanz would not have been appropriate. It was therefore not ineffective assistance when trial counsel did not ask for one. Moreover, even assuming Desmarat was entitled to a missing witness charge, he cannot show prejudice in light of the overwhelming evidence of his guilt.

4.     *The Fourth Amendment Claim*

Desmarat also claims that he is entitled to habeas relief because his motion to suppress and the state court's denial of his direct appeal were improperly decided. A Fourth Amendment claim cannot be raised on habeas review when an "opportunity for full and fair litigation" has been provided in state court. *Stone v. Powell*, 428 U.S. 465, 482 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."). The Second Circuit has already determined that New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710 *et seq*., is adequate. *See Capellan v. Riley*, 975 F.2d 67, 70, n.1 (2d Cir. 1992); *Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 549 (E.D.N.Y. 1999). The "litmus test" in the Second Circuit to determine whether a state prisoner has been denied an opportunity for full and fair litigation of his Fourth Amendment claims was set forth in *Gates*, which held that habeas review of such claims is allowed in only two circumstances: (1) if the state has provided no corrective procedures at all to redress the alleged violations; or (2) if the state has provided a corrective mechanism, but the defendant was

precluded from using that mechanism because of an unconscionable breakdown in the underlying process. *Capellan*, 975 F.2d at 70 (citing *Gates*, 568 F.2d at 840).

Desmarat was given the opportunity to fully and fairly litigate his Fourth Amendment claims regarding the constitutionality of the search of his motel room at a pretrial suppression hearing and on direct appeal. He gives me no reason to doubt that those procedures were fair. Accordingly, I cannot grant habeas relief on this ground.

CONCLUSION

For the foregoing reasons, the petition is denied. As Desmarat has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.


John Gleeson, U.S.D.J.

Dated:      Brooklyn, New York
            September 3, 2009